PALMETTO COAL CO., PETITIONER, v. COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket Nos. 9478, 18272, 20306.   Promulgated March 23, 1928.

*James C. Rogers, Esq., James F. Byrnes, Esq.,* and *Nelson T. Hartson, Esq.,* for the petitioner.
*George G. Witter, Esq.,* for the respondent.

**158**

OPINION.

ARUNDELL: The witness upon whom the petitioner relied for evidence as to proper depreciation rates was T. D. Wood, president and treasurer of the company. He signed the tax returns for the fiscal years under review and also signed the petitions in which the depreciation rates of 7 per cent and 10 per cent for the different items were claimed and admitted to be reasonable. Ten days before the hearing of this case Wood acquired information which led him to believe that the petitioner was entitled to depreciation in excess of that claimed. His statement was as follows:

> I began something like ten days ago, after getting information that led me to believe depreciation is greater than even set up by our income tax man, and having graduated from the fourth grade of a log school house, I wasn't able to pick out anything for myself so I employed competent bookkeeping ability to go into my records and tell me what it had cost me over a period of years, by the month, and by the year, exactly the replacement values I had paid for, and the name of the company, and the invoice of the company that furnished this replacement. I wanted to be perfectly fair. After I was led to feel that something had gone wrong, I wanted to dig out the whole thing, and I dug it up, and that is why I have made the variation since those depositions were taken.

Wood testified that the proper rates of depreciation were, wooden houses, 15 per cent; mine equipment, $33\frac{1}{3}$ per cent; live stock, 40 per cent.

The depreciation on wooden houses was apparently based upon the fact that extensive repairs were necessary to keep the houses in condition. While this indicates that rotting and deterioration of houses may have been unusually rapid, it does not necessarily prove that the life of a wooden house is shorter for that reason, provided that repairs can be made to offset the effects of the deterioration. Repairs were made and the houses are still in use at the present time, which is more than seven years since their erection, which indicates that the 15 per cent depreciation rate is excessive.

In support of the depreciation rate of $33\frac{1}{3}$ per cent on equipment the witness testified that additional lowering drums, car ropes, monitor cars, and mine cars were purchased every 2 or 3 years. The first three items cost $5,000, $1,000, and $2,000 to replace. These are insignificant amounts as compared with a total mine equipment

account of $119,578.49 at July 31, 1922, and less than one-third of $26,428.45, representing that account July 31, 1921. Eighty per cent of the value of mine cars was said to have been used up during the first 15 months of operation, but it has not been shown that they could be or have not been repaired and restored to serviceable condition.

The witness testified that mules lasted only 2½ years and trucks 1 year, but he did not inform us as to their salvage value at the expiration of the term of use. These items seem to be carried in one account called " Live stock and vehicles." Even assuming that the rate on mules is 40 per cent and on trucks 100 per cent, we are unable to apply these rates to this account since we do not know what items made up the balance of the account.

After a review of all of the circumstances, we are of the opinion that the rates originally claimed by the petitioner and allowed by the respondent are reasonable.

The petitioner's return for the fiscal year ending July 31, 1921, was filed on September 30, 1921, prior to the enactment of the Revenue Act of 1921. The return as filed showed a loss of $49,256.51.

Treasury Decision No. 3310, approved March 28, 1922, provided as follows:

If any taxpayer has, before November 23, 1921, filed a return for a fiscal year ending in 1921, and paid or become liable for tax computed under the Revenue Act of 1918, and is subject to an additional tax for the same period under the Revenue Act of 1921, a return covering such additional tax shall be filed at the same time as the returns of persons making returns for the fiscal year ended February 28, 1922, are due under the laws and regulations, and payment of such additional tax will be due in the same installments and at the same times as in the case of payments based on returns for the fiscal year ending February 28, 1922.

This ruling gave notice to taxpayers that additional returns were required in all cases where additional taxes were due under the Revenue Act of 1921. The return filed September 30, 1921, under the Revenue Act of 1918, was in conformity with all of the requirements of the Revenue Act of 1921, and a return filed under the latter Act would have been an exact duplication of the return as filed.

In the cases of *Fred T. Ley & Co.*, 9 B. T. A. 749, and *M. Brown & Co.*, 9 B. T. A. 753, the Board has held that in cases of this character where no additional tax was due by virtue of the Revenue Act of 1921, the return as filed was a legal return and started the running of the statute.

As a matter of fact the Commissioner in the instant case accepted the return filed by the petitioner under the 1918 Act as its return under the Revenue Act of 1921, and upon an audit of that return determined an additional tax, notice of which was mailed to peti-

tioner under date of May 7, 1926. The determination of the Commissioner showed a net income for the fiscal period ending July 31, 1921, of $73,977 instead of a loss of $49,256.51, as claimed.

The only provision in the Revenue Act of 1921, which would result in greater tax than that provided by the Revenue Act of 1918, in so far as petitioner was concerned, was the elimination of the $2,000 credit in respect to net incomes in excess of $25,000 as set forth in section 236 (b). The Commissioner's position would appear to be that if he found that a taxpayer's net income was in excess of $25,000 in the above circumstances, the statute of limitations would not run, regardless of when such discovery was made. On the other hand, had the tax been no greater under the Revenue Act of 1921 than under the Revenue Act of 1918, that is, had the net income been less than $25,000, the Board rulings cited would apply.

It does not appear to us that the running of the statute of limitations can be contingent upon whether the net income is above or below $25,000 when ascertained after the four-year period has expired. If such were true, the running of the statute in this case would depend upon the amount of depletion and depreciation allowable.

We are, therefore, of the opinion that since on the basis of the return no additional tax was apparently due under the Revenue Act of 1921 and since the Commissioner did not require an additional return for the fiscal period, and did not ascertain a deficiency until after four years had expired from the date the return was filed, the assessment and collection of any additional taxes for the fiscal year ending July 31, 1921, is barred by the statute of limitations.

The petitioner claims that it is entitled to a revaluation of a property due to discovery thereon of a merchantable body of coal not previously known to exist.

Section 234 (a) (9) of the Revenue Act of 1918 provides:

(a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

(9) In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case, based upon cost including cost of development not otherwise deducted: *Provided*, That in the case of such properties acquired prior to March 1, 1913, the fair market value of the property (or the taxpayer's interest therein) on that date shall be taken in lieu of cost up to that date: *Provided further*, That in the case of mines, oil and gas wells, discovered by the taxpayer, on or after March 1, 1913, and not acquired as the result of purchase of a proven tract or lease, where the fair market value of the property is materially disproportionate to the cost, the depletion allowance shall be based upon the fair market value of the property at the date of the discovery, or within thirty days thereafter; such reasonable allowance in all the above cases to be made under rules and regulations to be pre-

scribed by the Commissioner with the approval of the Secretary. In the case of leases the deductions allowed by this paragraph shall be equitably apportioned between the lessor and lessee.

Article 219 of Regulations 45 promulgated by the Commissioner regarding discovery is as follows:

(*a*) To entitle a taxpayer to a valuation of his property, for the purpose of depletion allowances, by reason of the discovery of a mine on or after March 1, 1913, the discovery must be made by the taxpayer after that date, and must result in the fair market value of the property becoming disproportionate to the cost. The fair market value of the property will be deemed to have become disproportionate to the cost when the newly discovered mine contains mineral in such quantity and of such quality as to afford a reasonable expectation of return to the taxpayer of an amount materially in excess of the capital expended in making such discovery plus the cost of future development, equipment, and exploitation.

(*b*) For the purpose of these sections of the Act a mine may be said to be discovered when (1) there is found a natural deposit of mineral, or (2) there is disclosed by drilling or exploration, conducted above or below ground, a mineral deposit not previously known to exist and so improbable that it had not been, and could not have been, included in any previous valuation for the purpose of depletion, and which in either case exists in quantity and grade sufficient to justify commercial exploitation. The discovery must add a new mine to those previously known to exist and can not be made within a proven tract or lease as defined in paragraph (*f*) infra. * * *

It has been shown that, when purchased by the petitioner, the property in question was not a proven coal property. No coal reserves were known or could be included in any estimate. It is true that the Sewanee seam coal horizon was known to pass through the property, but since the Sewanee seam was noted for its variableness in thickness, there was no assurance that coal of commercial thickness existed in the property.

The purchase price of $5,000 for 257.2 acres would not indicate that much value was assigned to the coal seam, when it is considered that valuable timber, limestone, and water-power possibilities were acquired. Therefore, we must conclude that the property was not acquired as a proven tract and consequently comes within the statute in that respect.

The petitioner carried on exploration which eventually disclosed and developed a workable seam of coal, not previously known to exist, and so improbable that it has not been and could not have been included in any previous valuation for the purpose of depletion, and which was in sufficient quantity to justify commercial exploitation. The petitioner's purchase and development of this property therefore satisfies the statute up to the point of determining whether or not the fair market value of the discovered mineral is disproportionate to the cost.

Based on a developed reserve of 449,000 tons and an estimated profit of $1 a ton, and after considering the plant and equipment necessary, and the reasonable life of the operation, we have arrived at a value of $215,000 for the coal in place in its developed condition on the date of discovery or thirty days thereafter. The cost of making this discovery was not in excess of the $63,000, which represented approximately the original cost plus the cost of development up to the point of commercial production.

Since the value of the discovery, $215,000, is materially disproportionate to the cost, $63,000, the petitioner is entitled to use the $215,000 as the basis for depletion.

Reviewed by the Board.

*Judgment will be entered on 15 days' notice, under Rule 50.*